Opinion issued April
20, 2012



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-00999-CV

———————————

S.H.R.,
Appellant

V.

Department of Family and
Protective Services, Appellee



 



 

On Appeal from the 314th District
Court

Harris County, Texas



Trial Court Case No. 200903028J

 



 

O P I N I O N

          Appellant S.H.R.’s parental rights to
his three minor children were terminated after a bench trial.  In three issues, appellant contends that the
evidence was legally and factually insufficient to support: (1) termination
under Family Code section 161.001(1)(D) (that he knowingly placed or knowingly
allowed the children to remain in conditions or surroundings which endanger the
physical or emotional well-being of the children); (2) termination under Family
Code section 161.001(1)(E) (that he engaged in conduct or knowingly placed the
children with persons who engaged in conduct which endangers the physical or
emotional well‑being of the children); and (3) a finding that termination
is in the best interest of the children. 
See Tex. Fam. Code Ann. § 161.001(1)(D),
(E) (West Supp. 2011).  We conclude that
while the evidence is legally sufficient, it is nonetheless factually
insufficient, and we reverse.

Background

          In
a joint trial, the Department of Family and Protective Services (DFPS) sought
to terminate the parental rights of both the biological mother and appellant as
to their three daughters S.M.R., G.J.R., and C.N.R.            Although
the record is somewhat unclear on certain dates, the following is a reasonable
chronology of the key events discussed at trial concerning appellant:

 

July
1992                                Appellant’s
conviction for possession of cocaine 

July
1998                                Appellant’s
misdemeanor probation for DWI

December
2003                      S.M.R. born 

October
2004                          Appellant’s
misdemeanor conviction of terroristic threat involving mother

May 2005                                G.J.R. born

January 2006                          C.N.R. born

Sometime
in 2007                  Appellant and
mother separate; children apparently go to live with mother

January
2008                          Appellant’s
misdemeanor conviction for interference with emergency telephone call involving
mother

July
1, 2008                            Fire at
Galveston residence where children lived with mother and Dustin Armstrong

June
2008                                Children go to live with appellant

     to September 2008

September
2008                      Children go to
live with their maternal aunt

September
21, 2008                Mother signs
letter giving custody of children to appellant

September
24, 2008                Children go to
live with appellant

December
22, 2008                Appellant leaves
children in care of maternal aunt when appellant voluntarily goes to jail for
two weeks to work off Class C misdemeanor fine

December
29, 2008                Appellant’s
misdemeanor conviction for criminal trespass

March
6, 2009                        Appellant’s
misdemeanor conviction for harassment threat to then-current girlfriend

May 7, 2009                            Children removed
from custody of maternal aunt based on reports of neglectful supervision and
medical neglect; DFPS appointed temporary managing conservator of children

June 30, 2009                          S.M.R. and G.J.R. test
positive for nonspecific type of herpes

July 3, 2009                            G.J.R.’s outcry to
unspecified Child Protective Services employee that “her father showers with
her”

July 16, 2009                          Claudia Mullin
conducts forensic interview of G.J.R. at Harris County Children’s Assessment
Center; G.J.R. tells Mullin that (1) “Daddy and mommy bit me and licked me,”
pointing to her genitals and behind, (2) she saw a picture of “her mother and her
father” “make it,” (3) “her father” rubbed her genitals; and (4) “her father”
urinated on the floor in front of her

August 10, 2009                     S.M.R. and G.J.R. test
positive for oral herpes and negative for genital herpes; C.N.R. tests negative
for genital herpes

October 19, 2009                    Children begin counseling
sessions with Raquel Wade-Zeller, a licensed professional counselor, on weekly
basis; children did not discuss sexual abuse during counseling; S.M.R. told
Wade‑Zeller about domestic violence between mother
and “the father” or “daddy”

October 26, 2009                    Appellant tests positive for
genital herpes

November 12, 2009                Appellant informs DFPS
caseworker of his herpes status; appellant discusses his concerns that children
might be abused by man who lived with mother

December 8, 2009                  Foster care agency report
stating mother has “moved to Alabama and [appellant] has been cleared of any
charges related to sexual abuse of [the children]”

May 4 to June 8, 2010                        G.J.R.’s extended
forensic evaluation conducted

September 14, 2010                Trial begins

 

Because this case turns on
evidentiary sufficiency, we will discuss the trial at length.

 

Exhibits

          DFPS
first introduced exhibits, some of which were mentioned during the trial.  Although no medical expert testified at trial
(nor any objection made to the lack thereof), the following key medical records
were admitted into evidence:

S.M.R.’s records – 

·       August 10, 2009 (age 6)
tests positive for type 1 (oral) HSV and negative for type 2 (genital) HSV 

·       August 27, 2009 doctor
office visit; doctor noted “HSV type 1 positive (oral type), HSV2 negative
(genital type),” as documented by August 10, 2009 lab reports

·       Earlier July 9, 2009 doctor
office visit noted:

“Foster
Mom took her in for a screening STD visit protocol of CPS and lab results
revealed positive HVS 1/2 type nonspecific to both IGG and IGM.”  

The
doctor also wrote, “HSV 1 or 2 positive for nonspecific type assay IGG and IGM‑need
confirmatory type-specific IGG assay in 4 weeks.”

No
lab reports are attached to records for this July office visit, however, the
records did include the following statement: “Lab corp
(6/30/09) HIV negative, hep panel negative, GC/C
negative, HSV 1/2 (non‑type specific)/IGG and IGM positive titers, RPR‑NR.”

 

G.J.R.’s records –

·       August 10, 2009 (age 4)
tests positive for type 1 (oral) HSV and negative for type 2 (genital) HSV

·       August 27, 2009 doctor
office visit; doctor noted “HSV type 1 positive (oral type), HSV 2 negative
(genital type)” as documented by August 10, 2009 lab reports

·       Earlier July 9, 2009 doctor
office visit noted, “4yo female here for evaluation due to positive HSV 1/2 IgG and IgM;” doctor also wrote,
“type specific HSV 1 IGG and HCV 2 IGG needed in 4 weeks to determine exposure
type”

 

 

C.N.R.’s records – 

           • August 10, 2009 (age 3) tests negative for
HSV type 2 (genital)

 

Appellant’s records –

          •
October 26, 2009 tests positive on for HSV type 2 (genital)

 

Appellant’s
prior criminal convictions were admitted into evidence.

 

·      
July 31, 1992 felony conviction for possession of cocaine with intent to
deliver

·      
July 17, 1998 misdemeanor community supervision judgment for driving
while intoxicated

·      
October 21, 2004 misdemeanor conviction of terroristic threat

·      
January 3, 2008 misdemeanor conviction for interference with an emergency
telephone call

·      
December 29, 2008 misdemeanor conviction for criminal trespass

·      
March 6, 2009 misdemeanor conviction for harassment

 

The biological mother’s
psychological evaluation was also introduced into evidence, but it was never
discussed at trial.

The
forensic interviewer

          DFPS’s
first witness was Claudia Mullin, a forensic interviewer with the Harris County
Children’s Assessment Center (CAC).  The
trial court accepted Mullin as an expert in forensic interviewing.

          Mullin
interviewed G.J.R., age 4, on July 16, 2009. 
The reason for the interview was because “they tested positive for
herpes,” an apparent reference to G.J.R. and S.M.R.’s June 30, 2009 test results
which were nonspecific as to the either HSV type 1 or HSV type 2.  The lab reports that specified that G.J.R.
and S.M.R. tested positive for oral herpes and negative for genital herpes
occurred one month later, on August 10, 2009.  Mullin also interviewed S.M.R., but not
C.N.R. as she was too young and nonverbal. 
Mullin also stated that G.J.R. and S.M.R. were referred to CAC because
“they were bathing -- that the father would bath with them” and “the children
seemed to be afraid of males.”  Mullin
was not told of any outcry that G.J.R. may have made.

          G.J.R.
told Mullin, “Daddy and mommy bit me and licked me,” pointing to her genitals
and behind.  Using anatomical dolls,
G.J.R. identified the genitals and behind. 
G.J.R. said she had seen “a picture of her mother and her father make
it.”  G.J.R. also said that she had seen
her grandpa “make it,” called him “Yummy Grandpa,” and talked about “eating his
bottom and his coochie.”  Using anatomical dolls concerning grandpa,
G.J.R. identified the genitals and behind.

          G.J.R.
told Mullin that “the father” rubbed her genitals and she described his
genitalia as “red and green.”  She also
said she was “[p]oked by a boat,” but Mullin had no
clarifying questions in her notes to explain what G.J.R. meant by that.  G.J.R. also told Mullin that “her father”
urinated on the floor in front of her and “sneaked” into the bathroom when she
was in the bathroom.

          On
cross-examination by appellant’s lawyer, Mullin said that she was aware that
the children were not living with appellant at the time of the interviews, but
she did not know if they were living with another man at the time.  Mullin “could not say” to whom G.J.R. was
referring when she used the term “daddy” or “father.”

          Appellant’s
lawyer questioned Mullin about a house fire and G.J.R.’s statement during the
interview concerning that “‘daddy’ pulled out his penis and peed on the
fire.”  Appellant’s lawyer offered into
evidence a fire department report describing a fire that occurred in Galveston
at a house where the children were living, but appellant was not.  The lawyer asked Mullin “[w]ouldn’t it have been smart to clarity who she was
talking about when she’s referring to ‘daddy’?” 
Mullin responded, “I asked her in the beginning who her daddy was, and I
cannot tell you because I did not write verbatim what name she answered.”  Mullin admitted that she could not accurately
answer whether “‘daddy’ was either the man that mommy was involved with or
[appellant].”

          Appellant’s
lawyer expanded the question to the entire forensic interview, “You never
clarified in the interview with [G.J.R.] who she was speaking about when she
used the word ‘daddy’?”  Mullin responded,
“No.”  “You’re not able to testify to
this Court when [G.J.R.] referred to or used the word ‘daddy,’ whether or not
she’s referring to the man her mother was living with or [appellant].”  Mullin responded,
“Correct.”

          Q.      So as a part of your interviewing
technique, wouldn’t it have been a good idea to establish who the child was
talking about when she was referring to “daddy”?

          A.      Yes.

          Q.      And you failed to do that correct;
correct?

          A.      Yes.

 

The trial court later acknowledged
that “she said and she did testify that she did not ask who daddy was, so let’s
just go on.  I think you’ve established
that.”

          Appellant’s
lawyer asked Mullin about G.J.R.’s statement during another part of the
interview:

          Q.      And then she said, “I was so mad he peed
on my carpet, so I got my belt and he was whupping me
- - whupping him . . .” and then she said, “I got him
out of his car . . .’” and then she said, “He pulled his clothes off and he was
driving . . .” and then she said “I run and I try to get my dad’s truck with my
teeth and it pulled out of . . .” and that’s what she said and you asked her,
“He took his clothes off in his truck? 
What did you see?”

          . . .
.

          Q.      Okay. 
In your professional opinion, what does that mean?

          . . .
.

                    THE
COURT:        No, I think the question is:
What does that mean? . . . .

                    [Mullin]: Whether or not he was naked and so I asked what she saw
when he took his clothes off.

          Q.      [By appellant’s lawyer]  And who were you talking about?

          A.      The man she was calling “daddy.”

          Q.      And we don’t know who that is; correct?

          A.      Correct.

 

G.J.R. then described
“daddy’s” “privates” as “[r]ed
and green” and described the shape by pointing to the vagina on an anatomical
doll.  Appellant’s lawyer discussed
G.J.R.’s statement about “Grandpa,” focusing on G.J.R.’s use of the colors “red
and green” to describe the shape of his genitalia.

          On cross-examination, the ad litem for the children asked
Mullin if she assumed that the people G.J.R. identified as mommy and daddy were
the parents.  She said she did not, but
in this case Mullin believes that G.J.R. identified mommy and daddy as “[w]hoever she considers to be mommy and daddy.”  Both the ad litem and the trial court asked
Mullin if, in her professional opinion, the children were sexually abused, and
Mullin stated, “I don’t have an opinion about that.”

          On redirect by DFPS, Mullin was asked if it as her job to
determine whether or not sexual abuse had occurred and she said it was
not.  Mullin, however, did not retract
her statement that she had no opinion about sexual abuse.  As a result of her forensic interview, Mullin
recommended an extended forensic evaluation of G.J.R.  The statements that concerned her were
“licking my bottom,” seeing naked pictures, use of the word “coochie,” and bringing up “yummy Grandpa.”

The
forensic interviewer

          DFPS’s
second witness was Raquel Wade‑Zeller, a licensed professional counselor,
and the trial court accepted Wade‑Zeller as an expert.  During therapy sessions, G.J.R. and C.N.R.
referred to their foster mother as “mommy.” 
S.M.R. referred to her father as “daddy,” but she never called him by
his actual name.  Appellant’s lawyer
objected to the implication that “daddy” meant appellant, and the trial court
overruled the objection stating, “I’m not sure that’s the insinuation, just
referring to ‘daddy.’”

          Wade‑Zeller
said she did not know that the mother had a boyfriend, did not get a specific
name for the man S.M.R. referred to as “daddy,” and did not explore the living
arrangements the children had with the mother’s boyfriend.  The trial court later acknowledged that “it’s
clear that this witness has already stated on the record she doesn’t know, she
never got a name for who daddy was.”

          S.M.R.
was the only child who communicated to Wade‑Zeller that there was
domestic violence between the biological mother and father.  Wade‑Zeller recommended that both
biological parents’ rights be terminated. 
The basis for her recommendation was that in order for the girls “to not
have reactive attachment disorder that they need a stable home so they’re not
being dropped off with relatives.  So
that they can have good relationships to demonstrate good relations to them,
who doesn’t use physical punishment with them.”

          On
cross-examination by appellant’s lawyer, Wade‑Zeller stated that nothing
came up in her conversations with S.M.R., G.J.R., or C.N.R. about sexual
abuse.  Wade‑Zeller said that when
the children talked about their current foster mom, “they do not call her mom,
they call her by name.”  The children
also referred to their aunt as “my daddy’s sister” or “my mommy’s sister.”

          The
ad litem asked Wade‑Zeller “if children of these ages were to have
sexually transmitted diseases, would that be an indicator of sexual abuse?” and
she answered, “Yes.”  Wade‑Zeller
had no opinion as to whether the children were afraid of their parents.

          On
further cross-examination by appellant’s lawyer, Wade‑Zeller stated she
had concerns about domestic violence occurring, because S.M.R. told her that on
multiple occasions “daddy” hit mom and there was screaming and yelling.  Wade‑Zeller admitted that she did not
know if “daddy” was appellant, and the trial court acknowledged this.  DFPS, however, then asked Wade‑Zeller
if the “father [appellant], all three of these children refer to the male
you’ve been discussing in terms of domestic violence and so for the as
‘daddy’?” and she replied, “Yes.”

 The forensic services supervisor

          DFPS’s
third witness was Lisa Bourgoyne, a Forensic Services
supervisor at CAC, and the trial court accepted her as an expert on forensic
evaluation.  Bourgoyne’s
only knowledge of the case is from reading the extended forensic evaluation of
G.J.R. and watching the CAC interview.  Bourgoyne has not had any direct contact with the
children.  Bourgoyne
stated that the children were referred to CAC because they “had tested positive
for herpes 1 and 2, and one of the children had disclosed they were taking a
bath with their father.”

          The
ad litem asked Bourgoyne if, based on her review of
the information, she had an opinion as to whether the children were sexually
abused.  Bourgoyne
stated “the likelihood of sexual abuse is there.”  She specifically referred to “licking and
biting” between G.J.R. and her father, as well as the grandfather.

          Appellant’s
lawyer established through Bourgoyne that G.J.R.’s
five forensic evaluations were conducted in May and June 2010, ten months after
Mullin’s initial evaluation.  Bourgoyne stated that she had no idea what happened to the
children while in foster care, and did not dispute Mullin’s prior testimony
that she [Mullin] was unable to say whether the children were sexually
abused.  Bourgoyne
agreed that it is appropriate for the forensic interviewer to establish who
“daddy” is when a child is referring to someone as daddy.         Appellant’s lawyer and Bourgoyne had an extensive discussion about the house fire,
“daddy” peeing on the fire, and whether “daddy” could have been appellant.  Bourgoyne agreed
she could not identify appellant as “daddy,” and the trial court acknowledged
that.  Appellant’s lawyer also discussed
with Bourgoyne the lack of clarification of the
context of any touching that occurred.  Bourgoyne responded by pointing out that anatomical dolls
were used to clarify.

          Finally,
appellant’s lawyer questioned Bourgoyne about the
summary of Mullin’s interview of G.J.R. which states that she “disclosed
details that are highly suggestive of sexual victimization and exposure.  That is, her dad was rubbing her when she was
rubbing him.”  Bourgoyne
was unable to point to any place in Mullin’s CAC interview that describes
G.J.R. and her “dad” rubbing each other. 
Bourgoyne again admitted that CAC was not able
to specifically identify “dad” and the trial court acknowledged this.

The caseworker
supervisor

          DFPS’s
fourth witness was Carly McGrew, a caseworker supervisor for DFPS who was
offered for her expertise on the issue of permanency.  At a November 12, 2009 conference with
appellant, he gave McGrew a copy of his test result for herpes.  McGrew’s testimony was that appellant “handed
me a positive result test for herpes, which was also similar to a test we had
on the children.”  McGrew further
testified that all three children had been diagnosed with “[h]erpes one and two”—a statement which is not supported by the medical records.

          During
the conference, appellant told McGrew that he “knew there was a man the mom had
in his home that he felt, told him that he was going to abuse his
children.”  Appellant also told McGrew
that the children were at a birthday party where another child had “herpes on
their mouth, and he saw his child kiss that child.”  McGrew said that appellant admitted to her
that he had not reported his suspicions to law enforcement.  During a February 9, 2010 conference with appellant,
McGrew discussed a “red bump” on C.N.R.’s bottom that was discovered by the
aunt.  McGrew stated that appellant had
nothing to say about what might have caused that.

          On
cross-examination by appellant’s lawyer, McGrew admitted that S.M.R., G.J.R.,
and C.N.R. had all tested negative for genital herpes in August 2009 and that
her agency knew that.  McGrew testified
that she believed that C.N.R. exhibited symptoms of genital herpes because of
statements made to her by the “caregiver and the aunt.”  McGrew said, “The aunt believed the marks on
the child’s bottom near their, their private areas were - - the bumps were a
symptom of herpes.”  McGrew also
initially stated that she believed there was something from a doctor concerning
C.N.R. having herpes, but then said she did not remember.

          Appellant’s
lawyer then discussed the statement in the March 30, 2010 permanency plan that
stated, “The children have all tested positive for herpes one and two.  The girls were tested a second time and their
results were negative.”  McGrew said, “We
spoke to the pediatricians who state herpes is hard to detect.”  McGrew stated that she did not know if any of
the children had manifested any symptoms of genital herpes since the August
2009 negative test results, as she was not the supervisor throughout that
entire time.

          McGrew
conceded that, up until the initial referral, there was no verbal outcry of
sexual abuse and no nonverbal indications of sexual abuse with respect to C.N.R.  Appellant’s lawyer showed her C.N.R.’s July
1, 2009 psychological evaluation, which states, “The caregiver
has not noted any signs or concerns suggestive of sexual abuse.”

          Regarding G.J.R.,
McGrew discussed the July 3, 2009 outcry that “her father showers with
her.”  Appellant’s lawyer asked McGrew if she knew who G.J.R. was
referring to, and McGrew stated that her understanding was that “the father”
was appellant.

          McGrew
stated that the children lived with appellant from June 2008 until September
2008, when they went to live with their maternal aunt.  She said he left them with the aunt because
he was “being arrested.”

          On
cross-examination by the mother’s lawyer, McGrew said that the mother named
appellant as a possible perpetrator of child abuse because appellant had
previously dated a fourteen year-old girl. 
The mother, however, never went to the police or filed a CPS report
accusing appellant of abusing the girls.

          On
cross-examination by the ad litem, McGrew agreed that it was “possible for
someone to test negative when in fact they have herpes.”  She also agreed that “you would need an
active outbreak at the time for it to test positive” and that would “explain
why these little children tested negative for herpes when in fact they did have
it.”  McGrew stated that she believed that
was the case with the three girls.       
The ad litem discussed appellant’s prior convictions with McGrew, and she said
that his criminal history gave her concerns about his ability to care for the
children to the point of recommending termination of his parental rights.

          On cross-examination by
appellant’s lawyer, McGrew stated she did not know if appellant had tested
positive for drug use during the pendency of the case.  She conceded that appellant’s last drug
conviction was in 1992 and that she had no personal knowledge that he had used
drugs since then; however, she nonetheless was still concerned about his drug
use affecting the children.  Appellant’s
lawyer clarified that since the birth of the children, appellant had only been
convicted of four misdemeanors (terroristic threat, interfering with an
emergency telephone call, criminal trespass, and harassment).  McGrew conceded that DFPS never requested a
criminal investigation of appellant.

The CPS
specialist

          DFPS’s fifth witness was Lanicia McCray, a CPS specialist.  McCray testified concerning both the mother
and father’s compliance with the family service plan.  McGrew also agreed with following question
from DFPS’s lawyer: “Have you been informed of by anybody, including the
children’s pediatrician, that on at least one occasion each and every one of
these children have [sic] been diagnosis as being
positive for herpes one and two?” 
Appellant’s lawyer told the trial court that he would wait for his
cross-examination to contest this statement, and the following exchange
occurred:

          Q.      (By
DFPS’s lawyer)  Now
is it your understanding that the children came up positive for herpes, not
just on June 15th of this year but prior to this year?

          A.      Yes.

          Q.      All
right.  Does the agency have copies of
every positive herpes test that has been run of these children as they were
brought to their pediatrician on a regular basis?

          A.      No,
we do not.

                    THE COURT:        How many have there been?

                    THE WITNESS:    At least three.

                    THE COURT:        And how come you don’t have records? 

                    THE WITNESS:    From the foster care agency, I didn’t
receive them.

                    THE COURT:        You get them from the foster care
agency?

                    THE WITNESS:    Yes, from their worker.

 

McCray also testified that CPS
confirmed that appellant’s previous girlfriend was fourteen and the mother was
sixteen when he first met her.

          McCray
stated that the initial reason that the children were removed was because of
neglectful supervision and medical neglect, because the girls were underweight
and had scabies, and G.J.R. had a sprained ankle.  When she interviewed the mother, McCray was
told that appellant drinks a lot when she is not there and that she was worried
about him being with the kids.

          McCray
said that CPS was concerned about appellant’s living arrangements, because he was
staying with his current girlfriend, who lived in a trailer with her own
children.  CPS was also concerned whether
appellant could financially support the children, his past history of domestic
violence, and “possible sexual abuse.”

          On
cross-examination by appellant’s lawyer, McCray acknowledged that on January
12, 2010 she “signed off on” a December 8, 2008 treatment plan for G.J.R from DePelchin Children’s Center that contains the following
progress update: “[G.J.R.’s] bio mother has moved to Alabama and her bio father
has been cleared of any charges related to the sexual abuse of [G.J.R] and her
bio siblings.”  The mother moved to
Alabama with her new boyfriend, Robert Boiter.  Although she read the treatment plan, she did
not write it, and she testified that she still had personal concerns about
sexual abuse even though she signed off on the plan.  McCray later testified that she does not make
“a habit of signing off on documents that aren’t true.”

          On
redirect from DFPS’s lawyer, McCray stated that she could not get a copy of the
Depelchin report unless she signed for it and her
signature was an acknowledgment of receipt, not an approval of the report.  McCray also said she had no knowledge that
appellant had ever tested positive for drugs.

The guardian
ad litem

          DFPS’s
sixth witness was Nikki Golyer, the guardian ad litem
for the children.  Golyer’s
number one concern for recommending termination of appellant’s parental rights
were the allegations of sexual abuse, G.J.R.’s outcries during her interview
with Mullin, and sexual behaviors displayed at the foster home.  Golyer has attended
therapy sessions with the children, and in response to a question from DFPS’s
lawyer she responded that she has neither heard any outcries from any of them
nor heard anything about them being abused or neglected by any one of their
parents.

The appellant

          DFPS’s
seventh witness was appellant.  DFPS’s
lawyer asked appellant about his convictions for terroristic threat on the
mother, interference with an emergency telephone call (also involving the
mother), criminal trespass, and harassment. 
This exchange did not appear to elicit anything relevant.  After discussing appellant’s compliance with
DFPS’s service plan, he was asked why he presented a copy of his STD test on
November 12, 2009 to McGrew.  Appellant
recalled that he presented it to McGrew because he was asked by a Ms. Roland to
get tested and to give the result to his CPS caseworker.

          Appellant
discussed telling McCray that the children were living with their mother and
her boyfriend, Dustin Armstrong, and that Armstrong had threatened to sexually
abuse his daughters.  The mother called
appellant, which is how he first learned about this: “Dustin said he’s gonna have sex with your daughters and she was laughing
about it.  And I was,
you think that’s funny.  And she said you
know he’s just joking.”  Appellant then
called Armstrong, who confirmed that he made the statement.

          Appellant
reported Armstrong to both CPS and the Galveston Police Department, but did not
recall the date.  Appellant said the
officer never made a report because the officer said “you and your
ex-girlfriend . . . are . . . arguing. . . . 
[T]hey’re just playing with your head. . . .
[I]f you don’t have any proof, we can’t do nothing about it.”  In response to a question from DFPS’s lawyer,
appellant denied knowing that the mother had serious mental health issues, such
as bipolar disorder and manic depression, or that she took medication while she
lived with him.

          DFPS’s
lawyer asked appellant the following: “Okay. 
Sir, what is your explanation for all three of your children having
tested positive for herpes one and two?” 
Appellant’s lawyer objected to mischaracterization of the evidence and
appellant not being a medical expert. 
The trial court said, “Okay. 
There’s a lot of conflicting evidence. 
You have documents that don’t say the same thing.  Now do you want to be more specific with this
witness as to which document?”  DFPS’s
lawyer then asked appellant, “[A]re you aware that Petitioner’s Exhibit No. 11
shows that your daughter, S.M.R., tested positive for herpes one and two on
June 15th of 2010?”  Appellant answered,
“From what I’m aware, yes.”[1]

          Continuing
this line of inquiry, DFPS’s lawyer asked appellant, “Are you aware that
Petitioner’s Exhibit No. 12 is a positive test for G.J.R. taken the same date,
June 15th of 2010, that she tested positive for herpes?”  Appellant answered, “Yes.”  DFPS’s lawyer next asked appellant, “You’re
aware that there is a positive - - there has been at least one positive test
showing the same thing for [C.N.R .], your youngest child?”  Appellant’s lawyer objected, “Judge, that
document is not in evidence in this case.” 
The trial court overruled the objection, and appellant answered, “Yes.”

          DFPS’s
lawyer asked appellant if he knew the day after he returned the children to the
mother on December 22, 2008 that the two older children had redness around
their vaginas.  Appellant replied that he
was not aware and agreed that he had custody of the children for three months
prior to that date.  There followed an
extended discussion of appellant’s noncompliance with the service plan and
attendance at court hearings.  Appellant
explained that he and his current girlfriend were moving into a four‑bedroom
house that belongs to the girlfriend’s mother. 
If he got custody of his daughters back, there would be three adults and
five children living in the house.

          On
cross-examination by the ad litem, appellant said that the mother was eighteen
when her first started dating her, but does not know her birth date.  He lived with her for four years, and he is
now forty-two.  The ad litem asked
appellant if he had ever dated anyone under the age of seventeen since he
became seventeen.  Appellant replied,
“Not that I remember.”  Appellant
admitted to: (1) arguing with the mother in front of the children, but denied
pulling her hair; (2) ripping the telephone off the wall while the children
were sleeping in the house; and (3) using marijuana “maybe about two, three
years ago” and cocaine “more than five years” ago.  Appellant said he had not consumed alcohol in
“probably about four years.”

          On
the last day of trial, DFPS’s lawyer offered medical records for C.N.R., which
he subpoenaed from Texas Children’s Hospital. 
The trial court sustained appellant’s objection, and the records were
not admitted.

          On
cross-examination by his lawyer, appellant again discussed the fire at the
Galveston home where the mother was living with Armstrong and the children and
G.J.R.’s statement that “daddy” peed on the fire.  The trial court noted that appellant “already
established that he’s never lived there. 
That’s very clear to this court. . . . 
And he was not involved in that fire.”

          Appellant
denied having ever done anything inappropriate with S.M.R., G.J.R., or
C.N.R.  His lawyer asked the following:

          Q.      . . . 
Okay.  You’ve heard all this
testimony about, you know - - all the documents about, you know, whether these
girls have herpes, or don’t have herpes. 
Are you able to tell the Court whether or not, of your personal
knowledge, whether or not the mother of these children has herpes?

          A.      No.

          Q.      You don’t know?

          A.      I don’t know.

 

Appellant testified that the mother
would leave with the children and that she “ran to” other men such as Dustin
Armstrong and another man named Corey or Kerry. 
The mother told appellant that she was having sex with other men.

          Appellant
testified that he had the children for three months until December 2008, when
he left the children with their aunt because he turned himself in on an arrest
warrant for an inspection or registration sticker.  He was in jail for two weeks.[2]  When he got out of jail, he did not go back
and pick the children up from the aunt because she had moved.  He told the trial court that he did not go
looking for the children because he did not know where they moved to.

Closing
arguments

          The
ad litem requested that appellant’s rights be terminated because of “evidence
that the father’s drug use, criminal history was testified that he sexually
abused the children.”  “And there’s
testimony that both the father and the mother frequently left the children with
relatives and didn’t return for months at a time to come back and get
them.  For instance the father testified
that he turned himself in on a Class C traffic warrant and didn’t even find out
till [sic] four months later that the children were in CPS care.  That was based on his own testimony.”

          Appellant’s lawyer
responded:

 

          Let’s address
(d) and (e). This whole case, Judge, has been nothing more than rank
speculation about medical tests that have been on both sides. We got in
evidence, you’ll find, you’ll find that there may be a positive test result for
-- and I can’t remember which girls -- and negative test results.  There is no conclusive evidence before the
Court that these girls have a sexually transmitted disease.  But furthermore, there is absolutely no
evidence before this Court that anyone -- or how any -- if they even have a
sexually transmitted disease, that it was communicated or transferred.  There’s no testimony in the record whatsoever
how any transmission of a sexually transmitted disease took place.  There’s nothing in the record.

          With respect to the -- you know, it
seems that the agency’s relying on the criminal record of my client.  The criminal record that is relevant to this
case, 1994 conviction for delivery of a controlled substance or whatever it
was, Judge, was ten years before the first child in this case was born, okay?  The other offenses that took place during the
time when these children were alive are misdemeanor offenses, none of which
involve the children, none of which in anyway threaten the children’s lives,
none of which in anyway endangered the children’s lives.  They are -- with respect to the (e) grounds,
there is no conduct that they have put before this Court -- there’s no evidence
of any conduct to show that anything that my client did endangered the physical
or emotional well being of these children.

          Any time that these
children -- at least any time that these children were left with someone, they
were always left with a family member and my client and [the mother] had
separated.  They weren’t together
anymore and she was living with some other guy in a trailer down in Galveston.  I don’t know. 
I don’t see -- I don’t see how the agency makes a case against my client
for allowing my child -- the children to remain in conditions or surroundings
which endanger physical or emotional well being of the child.  The children were brought into care, not for anything
that my client did.

          Judge, I know you’re well aware of all
the exhibits that have been admitted in this case and the evidence that’s before
the Court, but I ask the Court to look carefully.  The business of the sexually transmitted diseases
is a red herring.  There’s nothing --
there’s nothing in the record that substantiates that these children have such
a thing and that’s the only thing in this case that the department wants you to
hang their hat on.  That’s what this
whole case is about.  They have denied my
client access to his children for going on two years now.

 

          DFPS argued for termination as follows:

 

          As to the father, the evidence is
circumstantial, but it’s strongly circumstantial and the Court is allowed to
consider it.  But given the fact that the
father tested positive for herpes and [S.M.R.] and [G.J.R.], as indicated in Petitioner’s Exhibits
Nos. 10 through 12 --

                    [Appellant’s lawyer]: Judge,
objection.  In this case there is
evidence.  Not only that, the exhibit
that he’s saying is a negative test result, so it’s not true.

                    [DFPS’s lawyer]: Judge, let me
clear the record up.  The negative test --

                    THE COURT: Overruled.

                    [DFPS’s lawyer]: Thank you. --
that Mr. Newhouse is referring to is 13, that’s for [C.N.R.], that’s what
we tried to correct today.  But I’m just
speaking of [S.M.R.] and [G.J.R.].  So we have two very small children contracting
herpes which can be transmitted other than through sexual contact, but it’s
very unlikely.  But apart from the
sexually transmitted disease issue, Judge, the fact is that the respondent
failed to comply with the family service plan.

          The, the uncontested testimony of the
caseworker was that long before [appellant] started emailing either her or Ms.
McGrew the assigned caseworker Ms. Lanicia McCray had
maintained regular contact and had conversations, including personal
conversations with [appellant] about what it was he’s supposed to do.  

Mr. Newhouse would have the Court believe that because he
lived in Galveston that the agency stonewalled his ability to comply with the
family service plan, that is not supported by the
evidence and the testimony of both caseworkers, Ms. Carly McGrew and Ms. Lanicia McCray.

          As far as (d) is concerned, Judge, I
believe the sufficient testimony show that the father knew or had reason to
know that the mother had serious mental health issues.  But more than that --

                    [Appellant’s lawyer]: I heard him
testify he didn’t know.

                    [DFPS’s lawyer]: But more than
that, I believe that the testimony regarding his alleged report of the man he
thought had --

                    THE COURT: You said the
father said that?

                    [DFPS’s lawyer]: Yes, ma’am.

                    THE COURT: And you stand
corrected on that.  He said he didn’t
know.

                    [DFPS’s lawyer]: Okay.

                    THE COURT: But go ahead.

                    [DFPS’s lawyer]: Regarding the
father’s testimony that he went to a police station, talked to a police officer
about an allegation that a man had threatened to rape his three minor girls, I
think is less than credible.  The father
has failed to show, that in fact he is able to comply or to provide a safe and
stable home for the child.  So I believe
the third prong of the (o) test has been met.

          He shows up during the trial with
certificates that he was required under the family service plan to give to the
caseworker.  Some of those services he
performed and that there is not evidence that he
successfully completed were completed late in the case and even giving him
credit for those, there’s a number that he failed to complete.  If I counted the number of meetings that he
attended through a twelve step program, it was less than 20.  This case has been open for 18 months.

          The psychological evaluation and the
substance abuse evaluation indicated that he had an alcohol abuse problem.  I think the evidence shows that between his
criminal record and looking at Petitioner’s Exhibit No. 22B, the psychological
evaluation of [appellant], that he continues to be in denial about his drug and
alcohol problem and that those have not been addressed.  So I don’t believe that a person -- and
again, I would submit that the Court read 22B and see what the psychologist had
to say about his likelihood of him maintaining a strong recovery is
minimal.  Those are the words of the
psychologist.  So I believe that the
State has born its burden to show that the father’s rights should be terminated
pursuant to (d), (e), and (o) of subsection 161.001.1 of the Texas Family Code.

 

          On appeal, DFPS’s
brief refers to some portions of the exhibits that were not argued at trial.

 

 

The order terminating parental rights

 

          Following
the bench trial, the trial court signed an order terminating appellant’s
parental rights to the three children on the following grounds:

9.1  The Court finds by clear and convincing evidence that
termination of the parent-child relationship between [appellant] and the children
[S.M.R., G.J.R. and C.N.R.], is in the children’s best interest. 

 

9.2  Further, the Court finds by clear and convincing
evidence that appellant has:

 

9.2.1. knowingly placed or
knowingly allowed the children to remain in conditions or surroundings which
endanger the physical or emotional well-being of the children, pursuant to § 161.001(1)(D),
Texas Family Code; and

 

9.2.2. engaged in conduct
or knowingly placed the children with persons who engaged in conduct which
endangers the physical or emotional well-being of the children, pursuant to § 161.001(1)(E),
Texas Family Code.

 

Although requested by DFPS, the
trial court did not terminate based on section 161.001(1)(O)
(failure to comply with court order specifically establishing actions necessary
for parent to obtain return of child).

          Because
both appellant’s and the mother’s parental rights were terminated, the trial
court appointed DFPS as managing conservator of the children, as required by
Family Code section 161.207.  Tex. Fam. Code Ann. § 161.207 (West 2008).

 

 

Standard of Review

          The
evidence in support of termination must be clear and convincing before a court
may involuntarily terminate a parent’s rights. 
Santosky v. Kramer, 455 U.S. 745,
747, 102 S. Ct. 1388, 1391–92 (1982); Tex. Fam. Code Ann. § 161.001 (West Supp. 2011).  Clear and convincing evidence is “the measure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.”  Tex. Fam. Code Ann. § 101.007 (West 2008); In re
J.F.C., 96 S.W.3d 256, 264 (Tex. 2002).  Because termination findings must be based
upon clear and convincing evidence, not simply a preponderance of the evidence,
the Texas Supreme Court has held that the traditional legal and factual
standards of review are inadequate.  In re J.F.C., 96 S.W.3d at
264–67.  Instead, in conducting a
legal-sufficiency review in a termination-of-parental-rights case, we must
determine whether the evidence, viewed in the light most favorable to the
finding, is such that the fact‑finder could reasonably have formed a firm
belief or conviction about the truth of the matter on which the State bore the
burden of proof.  See id. at 266–67.  In viewing
the evidence in the light most favorable to the judgment, we must assume that
the fact‑finder resolved disputed facts in favor of its finding if a
reasonable fact‑finder could do so, and we should disregard all evidence
that a reasonable fact‑finder could have disbelieved or found to have
been incredible.  In re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005) (quoting In re J.F.C., 96 S.W.3d at 266).

Grounds for Termination

          In
proceedings to terminate the parent-child relationship brought under Family
Code section 161.001, DFPS must establish, by clear and convincing evidence,
one or more of the acts or omissions enumerated under subsection (1) of section
161.001 and that termination is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001.  Both elements must be established, and
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex. Dep’t of Human Servs. v.
Boyd, 727 S.W.2d 531, 533 (Tex. 1987). 
We will review the sufficiency of the evidence presented under the
specific statutory grounds found by the trial court in its termination
order.  Cervantes-Peterson v. Tex. Dep’t of Family & Protective Servs., 221 S.W.3d 244, 252 (Tex.
App.—Houston [1st Dist.] 2006, no pet.).

Sufficiency of the Evidence

          In
issues one and two, appellant argues that the evidence is legally and factually
insufficient to support the trial court’s termination of his parental rights
because DFPS did not present any evidence that appellant (1) knowingly placed
or knowingly allowed the children to remain in conditions or surroundings which
endangered the physical or emotional well-being of the children or (2) engaged
in conduct or knowingly placed the children with persons who engaged in conduct
which endangered the physical or emotional well-being of the children.  In issue three, appellant argues that the
evidence is legally and factually insufficient to support a finding that
termination was in the best interest of the children.

Legal sufficiency

          In conducting
a legal sufficiency review in a termination‑of‑parental‑rights case, we must determine whether the evidence,
viewed in the light most favorable to the finding, is such that the fact‑finder
could reasonably have formed a firm belief or conviction about the truth of the
matter on which the State bore the burden of proof.  Cervantes-Peterson, 221 S.W.3d at 249 (citing In re J.F.C., 96 S.W.3d
at 266).  In viewing the evidence
in the light most favorable to the judgment, we must assume that the fact‑finder
resolved disputed facts in favor of its finding if a reasonable fact‑finder
could have done so, and we should disregard all evidence that a reasonable fact‑finder
could have disbelieved or found to have been incredible.  Id. (quoting In re J.P.B., 180 S.W.3d at 573).

          Evidence
was admitted without objection that the children tested positive for oral and
genital herpes.[3]  Viewed in the light most favorable to the order of
termination and assuming that the fact‑finder resolved disputed facts in
favor of its finding, the evidence is legally sufficient that appellant engaged in
conduct or knowingly placed the children with persons who engaged in conduct which
endangered the physical or emotional well-being of the children.

          Because
there is legally sufficient evidence of one ground for termination, we need not
review the legal sufficiency of the other ground, that appellant knowingly
placed or knowingly allowed the children to remain in conditions or
surroundings which endangered the physical or emotional well-being of the
children.  We must, however, determine
the legal sufficiency of the evidence that termination was in the best interest
of the children because Family Code section 161.001 requires that DFPS
establish, by clear and convincing evidence, (1) one or more of the enumerated
acts or omissions and (2) that termination is in the best interest of the
child.  See Tex. Fam.
Code Ann. § 161.001.

          In determining whether the
termination of appellant’s parental rights was in the children’s best interest,
we may consider several factors, including (1) the children’s desires, (2) the
current and future physical and emotional needs of the children, (3) the
current and future physical and emotional danger to the children, (4) the
parental abilities of the person seeking custody, (5) whether programs are
available to assist the person seeking custody in promoting the best interests
of the children, (6) plans for the children by the person seeking custody, (7)
the stability of the home or proposed placement, (8) acts or omissions of the
parent that may indicate that the parent-child relationship is not proper, and
(9) any excuse for acts or omissions of the parent.  Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976); In re L.M., 104 S.W.3d
642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.).  The Holley
factors are not exhaustive, and there is no requirement that DFPS prove all
factors as a condition precedent to parental termination.  See In
re C.H., 89
S.W.3d 17, 27 (Tex. 2002).

With regard
to the children’s desires, the children did not testify or speak directly to
the trial court.  Wade‑Zeller,
however, testified that the children would like to stay with their foster
parent.  As to the children’s current and
future physical and emotional needs, as well as the current and future physical
danger to them, we have already held there to be legally sufficient evidence that
appellant engaged in or knowingly placed the children with others who engaged
in conduct which endangered the children’s physical or emotional
well-being.  With
regard to appellant’s “parental abilities,” his testimony regarding his
inability to look for his children because their maternal aunt moved and he did
not know where to find them, is sufficient to sustain that factor.  Finally, with regard to programs available to
assist the person seeking custody, there was evidence that appellant was
provided a family service plan requiring him to complete classes, and he did
not.  We hold there is legally sufficient
evidence to support the trial court’s finding that termination of appellant’s
parental rights was in the best interest of the children, and we overrule the
legal‑sufficiency portions of issues two and three and do not reach the
legal‑sufficiency portion of issue one.

Factual sufficiency

          A factual sufficiency review of a termination-of-parental-rights case requires our
determination of whether, considering the entire record, including evidence
supporting and evidence contradicting the finding, a fact‑finder could
have reasonably formed a firm conviction or belief about the truth of the
matter on which the State bore the burden of proof.  Cervantes-Peterson, 221 S.W.3d at 250 (citing In re J.P.B., 180 S.W.3d at 573; In re C.H., 89 S.W.3d at 25).  We consider whether the disputed evidence is
such that a reasonable fact‑finder could not have resolved the disputed
evidence in favor of its finding.  Id. (citing In re
J.F.C., 96 S.W.3d at 266–67). 
If, in light of the entire record, the disputed evidence that a
reasonable fact‑finder could not have credited in favor of the finding is
so significant that a fact‑finder could not reasonably have formed a firm
belief or conviction, then the evidence is factually insufficient.  Id. (quoting In re J.F.C., 96 S.W.3d at 266).

          We begin with
a factual sufficiency review of the evidence to terminate appellant’s parental
rights under section 161.001(1)(E), i.e., that he engaged in conduct or
knowingly placed the children with persons who engaged in conduct which
endangered the physical or emotional well-being of the children.  First, there is no documentary medical evidence in the record that
any of the daughters have genital herpes or any other sexually transmitted
disease.  There is also no documentary
medical evidence in the record that the father has oral herpes.

          A
layperson’s reading of the medical records suggests that only appellant tested
positive for HSV type 2 (genital). 
S.M.R. tested positive for HSV type 1 (oral) and negative for HSV type 2
(genital).  G.J.R. tested positive for
HSV type 1 (oral) and negative for HSV type 2 (genital).  C.N.R. tested negative for HSV type 2
(genital), and there is no test result in the record for C.N.R. concerning HVS
type 1 (oral).  Despite the absence of
evidentiary support, the record is replete with statements that the children
tested positive for both oral and genital herpes, including reference to other
tests and hearsay statements from pediatricians concerning the detection of
herpes, some of which was objected to and some of which was not.  No evidence was offered at trial as to
whether any other individuals who had lived with the children or associated
with them had been tested for herpes. 
Further, there was no expert medical testimony proffered concerning
transmission of the two types of the virus or whether either could be
contracted apart from sexual contact.

          Appellant has argued on appeal that
DFPS:

failed to present any witness that was competent to interpret
the test results or even inform the trial court about any of the following
material aspects of herpes:

          1.  How it is transmitted and how it can be
transmitted;

          2.  How far back in time do the tests go;

          3.  Can a person who has type 2 herpes transmit
type 1 to another person or vice versa;

          4.  If S.M.R. and G.J.R. came into DFPS care in
April of 2009, why was it only discovered that they may have or had type 1
herpes in July of 2010; and,

          5.  What proof is there that they might have had
type 1 herpes before April of 2009?

 

These are valid arguments.  DFPS
also acknowledged during its closing argument that “herpes
. . . can be transmitted other than through sexual contact.”

          Second, DFPS never provided direct
evidence that the children’s references to sexual abuse by “dad” and
“daddy” refer to appellant, something the trial court acknowledged.  Bourgoyne, a
supervisor for CAC, testified that a forensic interviewer should establish who
“daddy” is when a child is referring to someone as daddy, and she admitted that
was not done in this case.

          Third,
the treatment plan for G.J.R from the foster care agency stated, “[G.J.R.’s]
bio mother has moved to Alabama and her bio father has been cleared of any
charges related to the sexual abuse of [G.J.R] and her bio siblings.”  Golyer, the
guardian ad litem for the children who attended therapy sessions with the
children, stated that she had neither heard any outcries from any of them nor
heard anything about them being abused or neglected by either of their parents.

          Fourth,
although DFPS introduced evidence of appellant’s prior criminal record, the
only offenses that occurred after the birth of appellant’s oldest child were
misdemeanors.  DFPS does not argue that
these offenses occurred in the children’s presence or that they suffered any
actual injury from them.  

          We next
review the evidence to terminate appellant’s parental rights under section
161.001(1)(D), i.e., that he knowingly placed or
knowingly allowed the children to remain in conditions or surroundings which
endangered the physical or emotional well-being of the children.  On appeal, DFPS does not seriously argue this
as an independent ground.  After
appellant and the mother separated in 2007, the children primarily lived with
the mother or with a maternal aunt. 
Appellant kept the children from June to September 2008 and then
returned them to the maternal aunt from September 24 to December 22, 2008.

          The
evidence discussed at trial concerning the children’s time with the mother or
the maternal aunt was (1) that a fire occurred in July 2008 at the Galveston
residence where the children stayed with the mother and another man, Dustin
Armstrong, and (2) that Armstrong allegedly threatened to molest the
children.  DFPS does not argue that
appellant knew the fire could have happened, nor does
the record support such a finding. 
Further, there is evidence in the record that appellant spoke to the
Galveston Police Department about Armstrong’s threats.

          In
its appellate brief, DFPS refers to exhibits that were admitted, but not
discussed, at trial.  These exhibits
include the mother’s psychological evaluation, which contains the following
statement: “She stated that the children witnessed their father being
physically, verbally and sexually abusive to their [mother].”  Had that statement been raised at trial and
subjected to the adversarial system for discerning truth that our society
continues to use, then a failure by appellant to
challenge that statement would end our factual‑sufficiency inquiry.  We do not dispute that the exhibits are in
evidence.  But it shocks our conscience
for DFPS to suggest that a judgment can be factually sufficient based on
evidence never discussed or argued to the fact‑finder.

          If
factual‑sufficiency review still allows an intermediate appellate court
to reverse a legally sufficient judgment and remand the case to the trial court
for further proceedings, then surely an appropriate exercise of that power
allows the court of appeals to discount relevant, probative evidence which was admitted,
but never discussed or argued to the fact‑finder.  In this case, there is nothing in the record
to show that the fact‑finder ever considered any exhibits that were
admitted but not discussed or argued at trial.

          Considering the entire record, including both
evidence supporting and evidence contradicting the findings, we hold that a
fact‑finder could not reasonably have formed a firm conviction or belief
about the truth of the matters on which the State bore the burden of proof,
i.e., the grounds for termination under section 161.001(1)(D)
and (E).  We agree with appellant that
this case at trial was focused on sexual abuse and sexually transmitted
diseases and that the evidence to support termination was factually
insufficient.

          Because
there is factually insufficient evidence of both grounds for termination, we
need not review the factual sufficiency of the evidence that termination was in
the best interest of the children.  We
sustain the factual‑sufficiency portions of issues one and two and do not
reach the factual‑sufficiency portion of issue three.

Conclusion

          We
reverse the final order of termination and remand the case to the trial court
for further proceedings.

 

 

                                                                      Jim
Sharp

                                                                      Justice


 

Panel consists of Justices Jennings, Sharp,
and Brown.

Justice Jennings,
concurring.

Justice Brown, dissenting.











[1]         We note that the exhibit does not reflect a
June 15, 2010 doctor’s visit or lab result. 
The June 15, 2010 appears to be the date the information was printed
from the Texas Children’s Hospital Health Information Management database.

 





[2]         Although
not discussed at trial, we assume that appellant voluntarily went to jail to pay off the fine.

 





[3]         Assuming,
without deciding, that expert testimony was required on the issue of herpes, we
note that the
trial court accepted Mullin as an expert in forensic interviewing, and she
testified that “they [the children] tested positive for herpes.”  Neither DFPS nor appellant sought to define
the scope of Mullin’s qualifications as an expert.  Appellant was therefore required to object to
her qualifications as an expert or object to this evidence either before trial
or when the evidence was offered.  See Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 402, 409 (Tex.
1998).